THE TRONTOLITE. IMPERIAL OIL LIMITED v. UNITED STATES. MEXICAN GULF OIL CO. v. IMPERIAL OIL LIMITED et al.

(District Court, D. Maryland. August 8, 1925.)

No. 1270.

1. Collision ⬡74—Evidence held to show ship grounded in river channel because of bad seamanship of crew.

Evidence, in libels for damages caused by increased velocity of stream after grounding of vessel, held to show ship grounded in river channel because of bad seamanship of crew, and not because of changes in the river unknown to the pilot.

2. Collision ⬡74—Evidence held to show that mooring lines of ship were taut, and that increased velocity of current, caused by grounding of government's ship, was sole cause of snapping of mooring lines.

Evidence held to show that lines of ship moored to dock were taut, and that increased velocity of current, caused by grounding of government's ship, was sole cause of snapping of mooring lines.

In Admiralty. Two libels for damages arising from a collision—the first one being by the Imperial Oil Limited, as owner of the steamship Trontolite, against the United States, as owner of the steamship Halsey; the other by the Mexican Gulf Oil Company against the Imperial Oil Limited and the steamship Trontolite, the Imperial Oil Limited impleading the United States. The steamship Halsey held the sole cause of the damages to the Trontolite and to the property of the Mexican Gulf Oil Company.

Horace T. Atkins, Sp. Asst. Atty. Gen., and Clinton M. Hester, Admiralty Atty., U.

7 F.(2d)—26

S. Shipping Board, of Washington, D. C. (J. Frank Staley, Sp. Asst. Atty. Gen., and A. W. W. Woodcock, U. S. Atty., of Baltimore, Md., on the brief), for the United States.

Burlingham, Veeder, Masten & Fearey, of New York City (Thomas H. Middleton, of New York City, and George W. P. Whip, of Baltimore, Md., of counsel), for Mexican Gulf Oil Co.

Kirlin, Woolsey, Campbell, Hickox & Keating and W. H. McGrann, all of New York City, and Robert W. Williams, of Baltimore, Md. (J. H. Turnure, of New York City, on the brief), for Imperial Oil Limited and the Trontolite.

SOPER, District Judge. This controversy arises out of an accident that occurred at the dock of the Mexican Gulf Oil Company in the Panuco river, Tampico, Mexico, on the 23d day of September, 1922. Two suits are involved. The first libel was filed on October 2, 1922, by Imperial Oil Limited, owner of the steamship Trontolite, against the United States, as owner of the steamship Halsey, in the District Court of the United States for the Eastern District of Texas, and was later removed to this court. The second libel was filed in this court on August 4, 1923, by the Mexican Gulf Oil Company, owner of two barges, against the steamship Trontolite and Imperial Oil Limited, for damages to the barges and other property as the result of the collision with the Trontolite. The Imperial Oil Limited filed its answer to the libel of the Mexican Gulf Oil Company; and the Halsey then being within the jurisdiction of this court, the Imperial Oil Limited filed a petition under the fifty-sixth rule in admiralty, impleading the United States.

On the afternoon of September 22, 1922, the Canadian tank steamer Trontolite, a single screw vessel of 9600 tons dead weight, 430 feet long, and 57 feet beam, arrived in the Panuco river, Mexico, to load oil in bulk at wharf No. 6 of the Mexican Gulf Oil Company, which is located on the north bank of the river, about 4 miles above the city of Tampico. The wharf is approximately 600 feet long, runs parallel with the north bank of the river, and is built out from the bank to the northern edge of the channel on pilings. The river abreast of the wharf is about 1230 feet wide from bank to bank, but, at the time of the accident, the navigable channel for vessels drawing as much as 26 feet 6 inches did not exceed 250 feet in width. It was during the freshet season,

and by reason of recent rains up country the river was swollen, and the current was unusually strong. The strength of the current in midstream was approximately 6 knots per hour, most of the witnesses varying in their estimates from 5 to 7 knots, and inshore, along the wharf, the current was about 4 knots. When the Trontolite approached the wharf, the American tank steamer Halsey, a single screw vessel of 10,000 tons dead weight, 435 feet long, and drawing 26 feet 6 inches when loaded, was lying in the upper berth at the wharf, bow upstream, starboard side to the dock. The vessel extended upstream some 200 feet beyond the wharf. The Trontolite moved into the lower berth astern of the Halsey, and made fast with her starboard side to the wharf, bow upstream, so that her bow was about 50 feet from the stern of the Halsey. The after end of the Trontolite extended downstream beyond the wharf; her stern being about abreast of wharf No. 3 which is located about 150 feet downstream from wharf No. 6.

The Halsey finished loading during the night of September 22d, and on the morning of the 23d, about 7:30 a. m., under her own steam, and without the assistance of tugs. she made ready to leave her berth in charge of a pilot. In order to proceed to sea, she had to turn downstream. The channel was too narrow abreast the wharf to permit her to turn at this point, and it was the purpose of her pilot, as soon as he could maneuver the vessel out into the stream and straighten her out in the current, to cause her to drop down with the current past the Trontolite to a turning basin below the wharf. Her port anchor was hove in, and all her mooring lines were cast off, except one after spring line which was kept fast. The attempt was then made to swing the bow outstream on this line, by reversing the engines, but, since the current had deposited silt along the keel on the port side of the vessel while loading, she remained fast, and the heavy strain on the line caused it to part. A second and a third attempt was made to leave the pier in the same manner, and with like result.

The assistance of the tug Ajax was then procured. She was made fast on the port bow of the Halsey, and swung it to port, carrying the vessel out into the stream. But the ship did not straighten out into a position parallel with the wharf as was intended. She was carried to port by the force of the current on her starboard side, and, despite the combined efforts of her engines and those of the tug, she was forced across the channel and grounded on a bank opposite the wharf. After unsuccessful efforts to get off the bank, she lay at an angle of 45 degrees to the current of the river; her stern being about 100 feet from the bow of the Trontolite. The effect of the grounding of the Halsey was that of a great dam suddenly placed athwart two-thirds of the navigable channel, restricting the swift current within a narrow space, and directing it with increased velocity towards the Trontolite at the pier. The latter vessel was herself loaded, and, with steam up, was ready to sail. Her lines were not yet cast off, and she was awaiting two tugs she had engaged, one of which, the Ajax, had unexpectedly gone to assist the Halsey to leave her moorings. A short time, approximately 10 minutes, after the Halsey was grounded on the bank, the lines of the Trontolite suddenly snapped, and she went down the river, out of control, notwithstanding all of the efforts of her crew, colliding with the barges at wharf No. 3, and bringing up finally below the wharf on the south bank of the channel. It was impossible to get her off for 3 days. Damages are claimed for her detention, and for injuries received in collision with the barges. The Mexican Gulf Oil Company sues for damages to the barges and to the lower wharf.

The questions of fact to be determined are: (1) Was the grounding of the Halsey the result of negligence or of inevitable accident? (2) Did the lines of the Trontolite break by reason of the increased current produced by the position of the Halsey as she lay stranded, or because they had been negligently permitted to become slack, or was the breaking away caused partly by the increased current of the river due to the Halsey's grounding, and partly by the slackness of the Trontolite's lines?

[1] There is little difficulty on the first point in finding that the Halsey grounded by reason of bad seamanship. The only excuse offered is that an unknown and uncharted shoal had formed in the river during the preceding 48 hours, by reason of the freshet. But the evidence does not support the claim. The officers of the vessel set up the contention, but their information was admittedly secondhand, and their understanding of the situation was entirely erroneous. The captain and one of the mates thought that the normal channel was wide enough to permit the vessel to turn abreast of the pier. The evidence shows, however, that the normal channel was not more than 250 feet in width. The pilot of the Halsey of course had, or

should have had, precise knowledge as to the condition of the channel. He testified quite vaguely that the stern of the Halsey found some shallow place because the river was in a condition of freshet, but he also testified that the channel under normal condition was only the width of three ships; that is, from 150 to 200 feet. The bank on which the Halsey grounded was at least 200 feet from the wharf. According to her captain, the ship was hung up amidships, and the soundings showed that there was sufficient water under the stern, which was the part of the vessel nearest the wharf. A chart of the river, made shortly after the accident, and conceded by the pilot to be a correct representation of the channel at the time of the accident, shows that the shoal upon which the Halsey grounded was something over 200 feet from the wharf. The channel therefore was as wide as he expected it to be. As a matter of fact, there was only a narrow space between the port side of the Trontolite and the south side of the channel within which to drop down with the swift current. The maneuver was difficult and dangerous. It could have been made more safe by the employment of an additional tug, or avoided altogether either by proceeding to a turning basin farther up the river, or by permitting the Trontolite to sail first. Obviously the navigators of the Halsey undertook that which they were unable to execute because of the pressure of the current, and the failure must be attributed to their bad judgment, and not to changes in the river unknown to the pilot.

[2] The solution of the second question depends largely on the condition of the Trontolite's lines, and whether they were taut or slack when the Halsey grounded. It is not seriously contended that the Trontolite broke her lines solely because they were slack. There was no change in the situation, except that the Halsey left the wharf and was grounded. The first movement the Trontolite was obliged to anticipate, and to provide for, but, according to the testimony of the expert of the United States, the increased pressure on the Trontolite, by reason of the Halsey's leaving her berth, did not amount to more than one knot per hour, and was scarcely sufficient to have occasioned the accident to the Trontolite. It is conceded that the pressure of the current upon the Trontolite was materially increased by the grounding of the Halsey, and, since this occurrence took place negligently and unexpectedly, the Halsey must be at least partially responsible for the damages that ensued.

The real controversy is upon the point as to whether the Trontolite was also to blame because of slackness of her lines, gradually produced during the night as she was filled with oil at the pier, and not taken up before the Halsey sailed. The testimony shows that the Trontolite's deck was some 16 feet above the pier when she came in light, and was 4 or 5 feet below the pier after she was loaded. If the lines were permitted to become slack, the increased force of the diverted and intensified current would cause the Trontolite to swerve back and forth in her berth, and to and from the pier, subjecting the lines to sudden jerks sufficient to snap them asunder.

It is the contention of the United States that it is shown by the testimony of reliable and impartial witnesses that the lines had in fact become loose through the carelessness of the crew, and moreover that the amount by which the pressure was increased was so small as to have no effect upon a vessel properly moored. Therefore it is claimed that the very breaking away proves the looseness of the lines.

The weight of the evidence establishes the fact that the Trontolite's lines were of good quality and sufficient for the purpose. They were 9 in number, and 10 inches in diameter. But at 7 a. m. on the morning of the 23d, some, if not all of the lines were slack. Testimony to this effect was given, not merely by members of the crew of the Halsey, but by employees of the Mexican Gulf Oil Company. The latter were in a more impartial position than the representatives of either vessel, since there could hardly be negligence on their part, and they were concerned merely to prove that one or both of the vessels were responsible for the damages to the barges and the wharf. After 7:25 a. m., however, the Halsey's witnesses were occupied in trying to get her away from the dock, and in keeping her afloat, and there is but one witness, the dock foreman of the Mexican Gulf Oil Company, who positively asserts that the lines of the Trontolite were not tightened before she broke away. The accuracy of his observation is put in question by his failure to notice that the spring line of the Halsey broke three times at the pier, although he had general supervision of the operations on the wharf, being also occupied at the time with the hose line supplying oil to the Trontolite. Moreover, his testimony is specifically contradicted by the captain and third mate of the Trontolite, who testified that the slack in her lines was taken up about 8:15, before the Halsey

sailed, and before she was grounded. The pilot of the Trontolite and the port captain employed by her agent also testified that after 8 o'clock her lines were taut.

The preponderance of the testimony of the eyewitnesses supports the finding that the lines were taut when the Halsey sailed. But there remains to be considered the expert testimony of Capt. Frank M. Hill, retired, of the United States Navy, conceded to be a navigator of much experience and high qualifications. He expressed the opinion that the diversion of the current caused by the grounding of the Halsey increased its velocity by only 2 knots per hour, and that such an increase was insufficient to break the Trontolite's hawsers, if they were properly taut at the time. But the assumption of an increase of only 2 knots per hour is not warranted by the testimony. Before the accident, the current in midchannel was approximately 6 knots per hour, but at the wharf, only 4 knots per hour. When the Halsey finally settled on the bank at an angle of 45 degrees to the current, it formed, in the words of Capt. Hill, "a big dam thrown in there all of a sudden." The channel was contracted to about one-third its normal size, the velocity of the current was of necessity materially increased, and the direction of the current was diverted so as to sweep down upon the Trontolite at the pier. Counsel for the United States think it is not unreasonable to estimate that the new velocity of the current was 8 knots per hour, and the evidence in the case indicates that this is a conservative estimate. If so, the contrast must be made with the current of 4 knots at the pier before the accident. In other words, the pressure upon the Trontolite was at least doubled. Capt. Hill testified that, if the pressure was doubled, the lines of the vessel, even if taut, would probably not hold.

Some attempt has been made to apply to the circumstances of this case the principle of mechanics, illustrated when a stream of water moves from a large pipe into a small one, whereby the velocity is increased in the same ratio as the area is decreased. Manifestly this principle cannot be accurately applied, because precise dimensions cannot be obtained, and the conditions are not precisely analogous. Some part of the current which normally flowed into the channel went down the port side of the Halsey. On the other hand, it is certain that by far the greater part of the current flowed in the restricted channel between the vessels, and

there was necessarily produced a substantial increase in velocity. There is enough in the case to justify the finding that the lines of the Trontolite were tight and that the increase in the velocity of the current was sufficient to break them.

It follows that, in the opinion of the court, the Halsey was solely to blame for the damages to the Trontolite and to the property of the Mexican Gulf Oil Company.